IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JILLIAN WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-C-1815 |
| | ) | |
| ABT ELECTRONICS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JAMES F. HOLDERMAN, Chief Judge:

On April 3, 2006, plaintiff Jillian Watson ("Watson") filed a complaint against her former employer defendant Abt Electronics, Inc. ("Abt"), alleging claim of sexual harassment (later dismissed by Watson) and a claim of retaliation under Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e *et seq*. Abt has filed a motion for summary judgment on the remaining retaliation claim (Dkt. No. 47). Watson has filed a motion to strike, or alternatively to file a sur-reply to Abt's reply brief on its summary judgment motion (Dkt. No. 58). For the reasons stated below, Abt's motion for summary judgment and Watson's motion to strike or alternatively file a sur-reply are denied.

### BACKGROUND

The court recounts the relevant facts, many of which are disputed. Watson worked in the Custom Audio Department at Abt from July 2004 to until she was fired on January 20, 2005. (Def. L.R. 56.1 at ¶¶ 1,5.) Since mid-December 2004, Paginota Sveronis ("Sveronis") was the office manager of the Custom Audio Department, and Gregory Meinholz ("Meinholz") and Bill

1

Ekstrand ("Ekstrand") were both the department's managers. (Def. L.R. 56.1 at ¶¶ 5, 6; Pl. Resp. 56.1 at ¶¶ 5, 6.) Watson reported to all three managers. (Def. L.R. 56.1 at ¶¶ 5, 6; Pl. Resp. 56.1 at ¶¶ 5, 6; Watson Dep. at 27.)

There is a dispute of facts in the record regarding who made the decision to terminate Watson. Abt points to evidence in the record that Sveronis made the decision to terminate Watson and Meinholz approved the decision and was ultimately the one to inform Watson of her termination. (Def. L.R. 56.1 at ¶¶ 58-60.) In the court's view, however, the evidence relied upon Abt establishes that the decision to terminate Watson was in essence a joint decision made between Sveronis and Meinholz. (Def. L.R. 56.1 at ¶¶ 58-60.) Further, Watson refutes this evidence by submitting evidence establishing that Meinholz terminated her and that Sveronis had nothing to do with the decision. (Pl. Resp. 56.1 at ¶¶ 58-60.)

In addition, the parties dispute the grounds for Watson's termination. According to Watson, she was fired by Meinholz in retaliation for complaining to him about his sexual harassing her. Watson attested in her deposition that Meinholz would comment about a particular sweater she would wear and once when she was wearing the sweater touched her arm from collarbone to wrist in a way that made her uncomfortable. (Watson Dep. at 167.) Watson also asserts that for a two-week period in January 2005, Meinholz began to refer to her as "fat boobs" when the two were alone, and "FB" in front of others. (Watson Dep. at 173.) Watson "[a]fter he had said it enough times, told him it wasn't funny and asked him to stop," at which point Meinholz allegedly did. (Watson Dep. at 182.) At the time, Watson did not report Meinholz's comments to anyone else at Abt. (Watson Dep. at 183-84.) One week after Watson complained to Meinholz to stop calling her "fat boobs," Meinholz terminated her on January 20,

2

2005, stating that he was not happy with her performance.  (Watson Dep. at 203.)  The next day Watson contacted co-owner Ricky Abt to inform him about Meinholz's alleged sexual harassment and to ask him to investigate her termination.  According to Watson, when Ricky Abt contacted her again he told Watson that Meinholz had "100 percent admitted to saying fat — fat boobs" but that Ricky Abt defended Meinholz, saying Meinholz had just been joking.  (Watson Dep. at 221.)  Ricky Abt further informed Watson that she was fired because "it just wasn't working out."  (Watson Dep. at 221.)  According to Watson, when Watson told Ricky Abt that she would have to have her sister, who was her "power of attorney,"[1] take over, Ricky Abt "got defensive," responding that he "didn't want anything to do with it," and that Abt "is a big company and they have plenty of lawyers."  (Watson Dep. at 227, 229.)  Later, Abt CFO Philip Peterson, who had been asked to investigate Watson's allegations about Meinholz by Ricky Abt, allegedly informed Watson's sister that he had concluded his investigation and "If anything, Jill [Watson] was fired for sexually harassing Greg [Meinholz]."  (Jacquelyn Watson Dep. at 69.)  Watson later found out when she was rejected for unemployment that Abt was officially stating that she was fired for misconduct related to tardiness.  (Watson Dep. at 228.)

Abt offers different grounds for Watson's firing: her tardiness, attitude, and lack of dedication.  These reasons are disputed in the record.  Abt provides the testimony of Sveronis and Meinholz, as well as a coworker Amanda Ciccone, to support their premise that Watson was excessively tardy to work in violation of the Custom Audio Department's attendance policies, that Sveronis had counseled Watson about her tardiness to no avail, and that Watson had

---

[1]Watson apparently used the phrase "power of attorney" to show that her sister, who was not an attorney, would act as her attorney in this issue.  Watson concedes that she never signed any document giving her sister "power of attorney."

3

received learning letters (a letter either commending or disciplining employees that goes in their personnel file) regarding her tardiness. (Def. L.R. 56.1. at ¶¶ 10-43.) These facts, however, are all disputed in the record. Abt admits that there was no written attendance policy and that each department had discretion to develop its own rules regarding attendance. (*Id.* at ¶ 35.) Sveronis and Meinholz testify that in the Custom Audio Department there were strict attendance policies and set schedules, under which late employees who had asked an already-scheduled employee to stay later and cover the late employees' their shifts would still be considered tardy. (Id. at ¶¶ 11-18.) But Watson provides her own testimony and testimony of a coworker to show that, if a late employee got any other employee to cover the time period that the employee would be late, the managers did not mind, and that the Custom Audio department was very flexible about employees' schedules and constantly changed schedules to accommodate employees. (Pl. Resp. L.R. 56.1. at ¶¶ 10-18.) Also troubling is that there appears to be no set standard even between Sveronis and Meinholz regarding what constitutes being tardy: during the time Watson worked there, Sveronis believed that even one minute late was tardy, while Meinholz allowed for a cushion of six to ten minutes before disciplining an employee. (Sveronis Dep. at 42, 46-47; Meinholz Dep. at 45-49.) Watson's personnel file also contains two learning letters from Meinholz dated November 29, 2004 and December 7, 2004 regarding her tardiness. Watson claims that she did not know of these letters until this litigation, even though learning letters are supposed to be provided to the employees.

In addition, an incident on January 20, 2005, that appears to have touched off Watson's termination is disputed. According to Sveronis and Meinholz, Watson was unnecessarily rude to a new employee training in the work station where Watson normally sat, while Watson claims

4

that she was not rude to her and that Watson was merely frustrated that work station that she was then assigned was not set up for her to do her job. Watson also asserts that Meinholz yelled and swore at her for being rude to the new employee, when she had not been rude. Meinholz denies ever talking to Watson about the incident. Finally, it is worth noting that two days before Watson was terminated, she received a positive learning letter from Custom Audio's other manager, Ekstrand, for handling a customer situation well. (Pl. Ex. H at 1.) After she was fired, Watson received a learning letter signed by Greg Meinholz and dated January 20, 2005, stating her tardiness as a cause for her termination. (Pl. Ex. E, batestamp 819.)

Subsequently, on February 9, 2005 Watson filed a timely claim with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter on March 31, 2006. (Cmpl. Ex. A.) On April 3, 2006, Watson filed this lawsuit and Abt has responded with the pending motion for summary judgment.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, this court takes all facts and inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). Finally, the evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Stinnett v. Iron Work Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).

## ANALYSIS

As a result of the disputed facts identified above, the court must find that Watson survives summary judgment on her retaliation claim through the direct method. To prove a retaliation claim under the direct method, a plaintiff must establish through either direct or circumstantial evidence that she was engaged in a protected activity, she suffered an adverse action, and there was a causal link between the two actions. *Burks v. Wis. Dep't of Trans.*, 464 F.3d 744, 758 (7th Cir. 2006); *Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). The kind of evidence supporting a causal connection may include (1) suspicious timing, ambiguous statements, or statements from which the inference of discriminatory intent could be drawn; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employer's reason for firing the employee was pretext. *Phelan v. Cook County,* 463 F.3d 773, 781 (7th Cir. 2006); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)

The parties focus only on the causal connection prong, but the court pauses first to discuss whether Watson's telling Meinholz to stop sexually harassing her is protected activity.

All circuits, along with our district court, to decide the issue have determined that informal complaints still constitute protected activity for the purposes of a retaliation claim. *See Baqir v. Principi,* 434 F.3d 733, 748 (4th Cir. 2006 *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992); Pastran v. K-Mart Corp., 210 F.3d 1201, 1205 (10th Cir. 2000); *EEOC v. White & Sons Enters.*, 881 F.2d 1006, 1011-12 (11th Cir. 1989); *see also Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park,* No. 05-C-3837, 2006 WL 2192014, *14 (N.D. Ill. Aug. 1, 2006); *Kruger v. Principi*, 420 F.Supp.2d 896, 910 (N.D. Ill. 2006); *Jones-Walsh v. Town of Cicero*, No. 04-C-6029, 2005 WL 22936771, *5 (N.D. Ill. Sept. 14, 2005). The Seventh Circuit has yet to decide the issue. *See Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001). The court stands with the other circuits and judges of this district and holds that informal complaints constitute protected activity. Watson's telling her supervisor, Meinholz, to stop sexually harassing her satisfies the first prong of a retaliation claim under the direct method. To find otherwise—that the telling of a supervisor to stop his sexually harassing conduct is not an informal complaint—would be troubling public policy and not in keeping with the purposes behind Title VII. Regardless, Abt does not contest this prong and thus waived its argument that Watson's actions were not protected activity.

The court now addresses whether Watson has established a causal connection. Abt argues that Watson can rely at best on the temporal connection of one week between her alleged complaining of sexual harassment and her termination, and a mere temporal connection is rarely enough by itself to establish a causal connection between statutorily protected activity and an adverse action, *see Burks*, 464 F.3d at 758-59. Abt bases its assessment of the evidence on its

7

view that Sveronis, who did not know of Watson's complaints about Meinholz, was the one solely responsible for Watson's termination. Evidence in the record, however, establishes that at the least Sveronis and Meinholz were jointly responsible for the decision to fire Watson, and, taking all facts and inferences in favor of Watson as this court must on summary judgment, that Sveronis had nothing to do with the termination decision. Sveronis's lack of involvement in the termination signifies that Meinholz made the decision to terminate Watson one week after being told by Watson to stop his sexual harassment. *See Tomanovich v. City of Indianpolis*, 457 F.3d 656, 668 (7th Cir. 2006) (employer must have had actual knowledge of complaints for its decisions to be retaliatory).

Based on the record, there is more evidence than mere temporal connection supporting a causal connection between Watson's complaint of sexual harassment and her termination than just the suspicious one-week time period. First, as discussed above, Meinholz was responsible for terminating Watson one week after she complained to him about his sexual harassment and two days after receiving a positive learning letter from the other Custom Audio Department manager, Ekstrand. There are also genuine issues of material fact regarding the Custom Audio Department's policies on absenteeism, including whether an employee could be written up for being late if she has found any other employee to cover the period of time for which she is going to be late. As a result, the basis for firing Watson and whether it was pretextual is in dispute. The court also finds suspicious Ricky Abt and Peterson's response to Watson when she sought to have her termination investigated, specifically, Ricky Abt's statement in face of Meinholz's alleged confession to the "fat boobs" comments that Watson took the statements wrong, that Ricky Abt wants nothing more to do with the situation, and that Abt has a lot of lawyers, and

8

Peterson's statement that Watson sexually harassed Meinholz. Taken together, all of these factors are sufficient to establish genuine issues of material fact regarding whether there was a causal connection between Watson's protected activity and her termination.

With regard to Watson's motion to strike, Watson asks that the court strike Abt's improper replies to Watson's responses to Abt's own statements of fact filed in accordance to Local Rule 56.1. How strictly to apply the local rules is within the discretion of the court. *See Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004). In this situation, although Local Rule 56.1 does not allow replies to the nonmoving party's responses, the court does not find Watson to be disadvantaged by Abt's filing. Furthermore, the court is capable of assessing for itself compliance with the local rules and of applying the local rules to analyze the statements of fact and responses.

## CONCLUSION

Accordingly, defendant Abt's motion for summary judgment (Dkt. No. 47) is denied. Plaintiff Watson's motion to strike or alternatively file a sur-reply is denied (Dkt. No. 58). The hearing on the plaintiff's motion set for January 11, 2007 is stricken. All other dates still stand.

ENTER:

*[signature: James F. Holderman]*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: January 8, 2007